Carroll
No. 2000-329

NEW HAMPSHIRE DEPARTMENT OF RESOURCES
AND ECONOMIC DEVELOPMENT

v.

E. MILTON DOW AND
E. MILTON DOW D/B/A DOW SAND AND GRAVEL

Argued: March 7, 2002
Opinion Issued: July 17, 2002

*Philip T. McLaughlin,* attorney general (*Mary E. Schwarzer,* assistant attorney general, on the brief and orally), for the petitioner.

*Cooper, Deans & Cargill, P.A.,* of North Conway (*Randall F. Cooper* on the brief and orally), for the respondent.

DALIANIS, J. This case involves the location of a common boundary line between two parcels of real property located in Ossipee. The Superior Court (*T. Nadeau,* J.), relying upon a boundary line agreement entered into by the parties' predecessors in interest, quieted title in the State. We reverse and remand.

The record supports the following facts. The respondent, E. Milton Dow, and the State own adjacent parcels of real property in Ossipee. These parcels share a common boundary known as Hodgdon Mill Road. The respondent's parcel is west of Hodgdon Mill Road and the State's parcel lies to the northeast. A large esker is located in the vicinity of Hodgdon Mill Road. An esker is a "long narrow often sinuous ridge or

mound of sand, gravel, and boulders." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 775 (unabridged ed. 1961).

Both parcels were originally part of one large tract known as Lot 20. In the early 1800's, a mill was constructed on Lot 20 and the town of Ossipee laid out a public highway to the mill, which became known as Hodgdon Mill Road. The mill was destroyed in 1862, and in 1880, the town discontinued Hodgdon Mill Road and ceased maintaining it.

By 1972, Lot 20 had been subdivided, with one half of the property belonging to the Retsof Company Trust (Retsof), the State's predecessor in title, and the other half, known as Hobbs Exception, belonging to the Hobbs family (Hobbs), a predecessor in title to the respondent. In 1972 and 1973, John Morse of Kearwood Incorporated surveyed the Retsof property. This survey was used to create a subdivision plan, which was recorded in the Carroll County Registry of Deeds in June 1974. The Kearwood survey and subdivision plan depicted Hodgdon Mill Road as running along the top of the esker (upper road) between the parcels.

On September 7, 1974, Retsof and Hobbs entered into a boundary line agreement. With respect to the eastern boundary of Hobbs Exception, the agreement provides that it runs "along the westerly sideline of said Hodgdon Mill Road, across from land of the party of the first part, on a tie course and distance N 31° 12' 36" E, 2029.4 feet, to an iron rod set at the junction of the old Hodgdon Mill Road and the Pine River." The agreement does not reference any survey; however, the courses and distances set forth in the agreement describing Hodgdon Mill Road match those in the 1973 Kearwood survey. The agreement was recorded in the Carroll County Registry of Deeds on September 13, 1974.

Hobbs subsequently conveyed Hobbs Exception to Pollini Brothers Incorporated (Pollini) by warranty deed, recorded on September 30, 1976. Included with the deed was a sketch of the property depicting the physical location of Hodgdon Mill Road as the upper road, the same location as that shown on the Kearwood survey and subdivision plan.

In June 1978, the State purchased the Retsof parcel, which became known as the Pine River State Forest. After purchasing the property, the State marked the trees along the boundaries with blue blazes. The respondent purchased Hobbs Exception in April 1995, aware of the State's marked boundaries.

In 1997, however, the respondent disputed the State's location of Hodgdon Mill Road, claiming that a lower road, which ran diagonally down the eastern side of the esker, was the correct boundary (lower road). After examining the boundary line agreement and the Kearwood subdivision plan, the State concluded that it accurately blazed the boundaries called

for in those documents and informed the respondent by letter in July 1997 that the boundary was properly marked.

In December 1998, the respondent began cutting down trees on the State's parcel, some of which had blue blazes on them, and excavated gravel from the esker. After unsuccessfully attempting to stop the respondent's encroachment, the State petitioned the trial court for injunctive relief and damages, to which the respondent filed a cross-petition to quiet title.

Following an evidentiary hearing and a view, the trial court quieted title in favor of the State, finding that the boundary line agreement established the upper road as the intended common boundary. Because it relied exclusively upon the boundary line agreement to locate the parties' boundary, the court declined to consider the historical location of Hodgdon Mill Road. The respondent filed a motion for reconsideration, which was denied. This appeal followed.

On appeal, the respondent argues that the trial court erred by: 1) refusing to locate Hodgdon Mill Road as it existed in 1858; 2) admitting the boundary line agreement into evidence and finding it relevant to determine the parties' common boundary; 3) admitting the 1976 Pollini deed and sketch into evidence; and 4) ruling that the boundary line agreement could not be reformed due to mutual mistake of the parties.

"To prevail on appeal, the [respondent] must show that the trial court's determination of the disputed boundar[y] was unsupported by the evidence or was erroneous as a matter of law." *Flanagan v. Prudhomme*, 138 N.H. 561, 565 (1994). Because we conclude that the boundary line agreement is unenforceable, we do not reach the respondent's remaining arguments.

In New Hampshire, RSA chapter 472 (1992) governs the criteria for creating a boundary line agreement. It provides that:

> Whenever the boundary line between the land or estates of adjoining owners is in dispute, and the location of the same as described in the deeds of said owners or of their predecessors in title cannot be determined by the monuments and boundaries named in any of said deeds, the parties may establish said line by agreement in the following manner, and not otherwise.

RSA 472:1. It further provides that the agreement shall be in writing,

> reciting that ... the division line between their lands is in dispute, that the line described in their respective deeds or in the deeds of any of their predecessors in title cannot be located

on the ground by reason of the loss or obliteration of the monuments and boundaries therein named and described, and containing a full and complete description of the line thus agreed upon and established . . . .

RSA 472:4. In addition, the statute provides that "[t]he line agreed upon shall be surveyed and established by courses and distances, and suitable and permanent monuments shall be placed at each end and at each angle of the boundary so agreed upon." RSA 472:3.

The respondent argues that the agreement is unenforceable because it does not comply with all of the statutory formalities. Specifically, he contends that the agreement is invalid because it does not identify the survey upon which it is based and because monuments were not placed along the boundary described in the agreement.

The interpretation of a statute is to be decided ultimately by this court. *Pope v. Town of Hinsdale*, 137 N.H. 233, 237 (1993). We begin by examining the plain language of the statute using the ordinary meanings of the words to determine legislative intent. *Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 277 (1992). In construing a statutory provision, we construe the statute as a whole. *Theresa S. v. Sup't of YDC*, 126 N.H. 53, 55 (1985).

We disagree with the respondent that the agreement is invalid because it does not refer to a survey. There is no requirement in the statute that the parties expressly refer to the survey upon which their agreement is based. Rather, RSA 472:3 requires only that the agreed upon boundary line be surveyed and established by courses and distances. This requirement was fulfilled, as evidenced by the Kearwood survey of 1973.

The trial court found, however, that the parties to the boundary line agreement created an ambiguity "by failing to . . . place suitable monuments at each angle of the agreed upon boundary." Nevertheless, the court ruled that the agreement was valid because the statute does not expressly invalidate an agreement that fails to comply with all of the statute's requirements. While the statute is silent as to the consequences of non-compliance, RSA 472:1 provides that any agreement entered into must be created pursuant to the manner set forth in the statute, "*and not otherwise.*" (Emphasis added.) RSA 472:3 provides that suitable and permanent monuments shall be placed at each angle of the disputed boundary. Generally, the use of the word "shall" in a statutory provision is a command, requiring mandatory enforcement. *See City of Manchester v. Doucet*, 133 N.H. 680, 683 (1990).

As a general principle of statutory construction, we presume that the legislature knew the meaning of the words it chose, and that it used

those words advisedly. *Ahern v. Laconia Country Club, Inc.*, 118 N.H. 623, 624-25 (1978). Having considered RSA chapter 472 as a whole, we interpret it as conditioning the validity of a boundary line agreement upon satisfying all of the statutory formalities. To otherwise uphold a boundary line agreement as valid would eviscerate the statute, rendering its mandatory language meaningless. We will not construe the statute in such a manner. *See Appeal of Barry*, 142 N.H. 284, 287 (1997). While we recognize that this construction could create an unfavorable result in some cases, we will not "redraft legislation to make it conform to an intention not fairly expressed therein." *Ahern*, 118 N.H. at 625.

The State, relying upon *Dame v. Fernald*, 86 N.H. 468 (1934), argues that the boundary line agreement should be given effect in this case even if it fails to comply with the statutory formalities of RSA chapter 472. We disagree. In *Dame*, we held that a boundary line agreement that was not executed with the statutory formalities could nevertheless constitute color of title for the purpose of adverse possession. *Id.* at 470-71. Because adverse possession is not an issue in this appeal, we find *Dame* distinguishable.

Accordingly, we reverse the trial court's ruling that the boundary line agreement was enforceable. Because the trial court's decision was based solely upon the boundary line agreement, we remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

BRODERICK, J., sat for oral argument but did not take part in the final vote; BROCK, C.J., concurred; DUGGAN, J., dissented.

DUGGAN, J., dissenting. The principal issue in this case is whether a boundary agreement is invalid if the parties fail to follow all of the specific procedures in RSA chapter 472 (1992). The majority invalidates the boundary agreement because it does not comply with all of the statutory formalities. More specifically, because monuments were not placed along the boundary line described in the agreement, the majority concludes that the agreement is void and unenforceable. As I disagree with this interpretation of the statute, I respectfully dissent.

RSA chapter 472 sets forth the criteria for parties entering into boundary line agreements. Pursuant to RSA 472:1, whenever there is a disputed boundary, parties may establish the line by agreement "in the following manner, *and not otherwise*." (Emphasis added.) RSA chapter 472 then sets forth the specific procedures that must be followed when parties enter into boundary line agreements. *See* RSA 472:3, :4. For example, the statute requires that parties must survey their new boundary

line, place suitable and permanent monuments around the line, document the agreement in writing and record the agreement. *See* RSA 472:3, :4. In this case, the parties followed all of the statutory formalities except the requirement that they place suitable and permanent markers at each end and at each angle of the agreed upon boundary. *See* RSA 472:3.

While I agree that the legislature's use of the word "shall" in RSA 472:3 is mandatory and not hortatory, I disagree with the majority's conclusion that an owner's failure to follow the procedures set forth in RSA chapter 472 requires an automatic invalidation of the boundary line agreement. Under our case law, when the legislature sets forth a mandatory requirement but does not provide how that mandate is to be enforced, the appropriate mode of enforcement must be judicially determined. "Our inquiry in similar cases has generally focused on two factors: consideration of the statutory goals and consideration of whether the party seeking relief has shown prejudice as a result of the statutory violation." *Appeal of Martino*, 138 N.H. 612, 615 (1994).

In this case, the object of the statute would not be defeated if this court upheld the boundary line agreement. The apparent object of RSA chapter 472 is to provide a mechanism by which adjoining owners of land can resolve boundary line disputes. The requirement of placing monuments on the property is seemingly to ensure finality with regard to the chosen boundary line. By requiring monuments, all parties to the boundary line agreement and their subsequent purchasers are certain to know where the new boundary line exists. It is doubtful, however, that the legislature intended that a party's failure to abide by this statutory formality should result in an automatic determination that the boundary line agreement is unenforceable. Such a strict interpretation of the statute would not further the legislature's goals of finality, but would instead upset many boundary line agreements that have long been settled yet do not comply with all of the requirements of RSA chapter 472.

Nor was the respondent in this case prejudiced by the failure to place monuments around the boundary line. The trial court found that when the respondent purchased Hobbs Exception, he had actual notice of the boundary agreement, received a sketch of the property depicting the physical location of Hodgdon Mill Road as the "upper road," and was aware of the blue blazes that the State had marked on the trees around the boundaries. As there is ample evidence in the record to support the finding that the plaintiff had notice of the boundary line agreement and understood the agreement to depict the physical location of Hodgdon Mill Road as the "upper road," the plaintiff has failed to prove that he was prejudiced in any way by the failure to place monuments around the boundary line.

As upholding the boundary line agreement would neither defeat the object of the statute nor prejudice the respondent, I would hold that the boundary line agreement is valid and enforceable.